UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO M. GARCIA, Jr._<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW M. JUAREZ, Jr.,<br><br>Defendant. | 1:12-cv-00750-AWI-EPG<br><br>ORDER REQUIRING PRODUCTION BY THE CDCR OF DOCUMENTS WITHHELD PURSUANT TO THE "OFFICIAL INFORMATION PRIVILEGE" |

Roberto M. Garcia Jr. ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983, although Plaintiff has been appointed counsel for purposes of this motion to compel and for an upcoming settlement conference. (Doc. 76) Plaintiff filed the Complaint commencing this action on May 8, 2012. (Doc. 1.) This case now proceeds on the First Amended Complaint, filed on June 14, 2013, against defendant Sergeant Matthew M. Juarez, Jr. ("Defendant") for excessive force. Specifically, Plaintiff alleges that, on May 23, 2011, Defendant Juarez kicked him with extreme force, pulled Plaintiff's arm behind his back, which injured Plaintiff's shoulder, and used profane and hostile statements. (Doc. 11, at 5).

Following the incident, the Office of Internal Affairs conducted an investigation of the incident. Defendant, and later the prison, withheld all documents at all associated with that investigation on the basis of the official information privilege. After much litigation, the Court required the prison to provide the documents from that investigation for review *in camera*. As described below, those documents are composed of reports and interviews from percipient

witnesses about the underlying event, as well as the conclusions of the Office of Internal Affairs.

Recognizing the importance of security issues concerning the prison, the Court has performed an exhaustive examination of the law regarding the official information privilege and evaluated the documents consistent with the courts' guidance. The Court finds that, with limited exception, the documents should be produced to Plaintiff because the importance of those documents to the Plaintiff's case and truthfinding in this matter outweighs the asserted security interests.

I. BACKGROUND

Plaintiff first requested a "copy of the report of the investigation conducted by Internal Affairs Agent M. Dunlop concerning Defendant's misconduct" on December 28, 2014. (Doc. 41, p.13). Defendant Juarez objected to that request on multiple grounds including "irrelevant," but ultimately stated that Defendant did not have possession of the requested document. (Doc. 41, p.24).

On July 16, 2015, Plaintiff filed a request for non-party discovery requesting documents and information "concerning the investigation conducted by the Office of Internal Affairs on this matter . . . ." (Doc. 44, p. 4) Defendant Juarez again objected on grounds including that they included Peace Officer personnel files that implicated the Officer's privacy interests and "should not be ordered produced except upon a compelling showing of relevance," because "[t]here is typically private information in personnel records . . . ." (Doc 45, p.3). Defendant Juarez also referred to California Evidence Code section 1040, which is a California law allowing a public entity to refuse to disclose official information acquired in confidence by a public employee if "there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice." Cal. Evid. Code § 1040. That Evidence Code section also provides that "In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered." Cal. Evid. Code § 1040. Defendant Juarez supported his argument stating "The CDCR has a very real concern that the release of the

confidential records could endanger the health and safety of the individuals to whom the records pertain" and "could precipitate such acts of violence and lead to the death of or serious bodily injury to inmantes, personnel of the CDCR, and even third parties outside the CDCR facilities, especially in the context of gang-affiliated matters." (Doc 45, p.3-4). Defendant also stated that "The requested documents may include descriptions of law enforcement tactics and investigative information and techniques." (Doc. 45, p. 4). Finally, Defendant argued that the documents were protected under privacy rights, which cover information such as the "social security number, physical description, home adddress, and home telephone number." (Doc. 45, p. 5).

This Court granted Plaintiff's motion to issue the subpoena on November 17, 2015. (Doc. 51). Pursuant to a separate request by Plaintiff, the Court also issued a subpoena on the California Department of Corrections and Rehabilitations ("CDCR") on December 8, 2015. (Doc. 55).

On February 26, 2016, the CDCR filed a motion to quash the subpoena for failure to provide a reasonable time to reply. (Doc. 60). The Court granted the motion to quash in part, providing additional time to respond to the subpoena. (Doc. 62).

On April 1, 2016, the CDCR filed a "Notice of Compliance" with the order, stating that "On April 1, 2016, the CDCR responded to the subpoena in compliance with the Court's order." (Doc. 65).

The Court held a status conference on April 26, 2016, and learned the the CDCR had not produced any documents in response to the subpoena except those in Plaintiff's C-file, and otherwise had withheld all responsive documents as privileged. (Doc. 71, p. 3). The Court gave Plaintiff leave to file a motion to compel. (Doc. 71, p.3) The Court also appointed counsel for Plaintiff for the limited purposes of assisting Plaintiff to bring a motion to compel responses and documents from the CDCR that the CDCR has claimed are privileged, as well as assisting Plaintiff with preparing for and participating in a settlement conference. (Doc. 76).

\\\

\\\

Plaintiff filed a motion to compel discovery from the CDCR on May 23, 2016. (Doc. 74). It argued that the documents being withheld were not privileged under the law, and it attached the privilege log from the CDCR. Along with that privilege log, the CDCR also included a Declaration in Support of the Privilege, which represented the following regarding the Investigation files:

> I have reviewed the document identified as three in the privilege log. This document is confidential. The report was prepared by a special agent in the Office of Internal Affairs as part of his duty to investigate allegations of excessive force. The document contains statements made by four inmate witnesses who provided the information with the understanding that it would remain confidential. Release of the document could jeopardize their safety and inhibit other inmates from providing truthful accounts in future investigations. Further, the document contains information concerning law enforcement techniques that, if released, would threaten institutional security. Finally, the report contains confidential personnel information concerning a correctional officer. (Doc. 74, p.14).

The CDCR opposed the motion to compel, on the basis of information provided in the declaration, and requested *in camera* review of the documents. (Doc. 78). The Court ordered delivery of the withheld documents *in camera*. (Doc. 81). CDCR delivered the documents on June 30, 2016.

## II.      LEGAL STANDARDS

The 9th Circuit has rarely and only briefly discussed the official information privilege. The 9th Circuit case most frequently cited for the privilege is Kerr v. United States Dist. Ct. for the N. Dist. of Cal., 511 F.2d 192 (9th Cir. 1975), aff'd 426 U.S. 394 (1976). In Kerr, the 9th Circuit examined the government's claim of the official information privilege as a basis to withhold documents sought under the Freedom of Information Act. The court ultimately let stand a district court order requiring production of personnel files from members and executive personnel of the California Adult Authority, over the government's privilege objection. The Court rested its decision primarily on the government's use of a blanket objection rather than a specific privilege claim as to a particular document or class of documents. In doing so, it made the following comments about the contours of the privilege:

> Petitioners further argue, however, that established principles of California law and federal law create an absolute or qualified privilege for the personnel files . . . .
>
> The claim of privilege under California law is based upon California Evidence Code s 1040, and California Government Code §§ 6250—6260 and 6254(f) (Supp. 1974). However, the civil rights action was instituted in federal court under a federal statute, 42 U.S.C. § 1983, which was enacted particularly to vindicate federal rights against deprivation by state action. . . . In federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege. . . .
>
> Petitioners also contend that the common law governmental privilege (encompassing and referred to sometimes as the official or state secret privilege) covers the requested documents.
>
> These cases, however, indicate that this is only a qualified privilege, contingent upon the competing interests of the requesting litigant and subject to disclosure especially where protective measures are taken, as in this case.

Kerr v. U.S. Dist. Court for Northern Dist. of California, 511 F.2d 192, 198 (9th Cir. 1975) aff'd 426 U.S. 394 (1976) (internal citations and quotations omitted). Thus, the Kerr court made clear that (1) there is no absolute privilege for government records, (2) federal common law governs, (3) the official information privilege is a qualified privilege, and (4) the privilege depends on the competing interests of the litigant and the governmental entity.

Given that this is a common law privilege, it is worth examining the two cases relied on by the 9th Circuit and cited by the government in Kerr in support of their official information privilege claim. In Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 788, 792—795 (D.C. Cir. 1971), the D.C. Court of Appeals affirmed a district court's order compelling the government to submit documents for *in camera* inspection, and provided the following explanation of the privilege issues involved:

> Documents such as those encompassed in the District Court's order would normally remain part of the internal files of the agencies involved in the absence of an appropriate demand. When such demand is made in conjunction with discovery sought in the courts, the settled rule is that the court must balance the

> moving party's need for the documents in the litigation against the reasons which are asserted in defending their confidentiality.
>
> The government's interest in confidentiality is plain where the documents make reference to military or diplomatic secrets. But plaintiffs indicated clearly that they seek no such secrets, and the District Court's order explicitly provides that the government is not required to produce any documents or parts of documents which contain such secret material.
>
> The government may still have an interest, however, in avoiding disclosure of documents which reflect intra-executive advisory opinions and recommendations whose confidentiality contributes substantially to the effectiveness of government decision-making processes. *In camera* inspection of allegedly privileged documents—as ordered here by the District Court—is a procedure approved by the courts at least where, as here, military and diplomatic secrets are not at issue. Of course, the party seeking discovery must make a preliminary showing of necessity to warrant even *in camera* disclosure, but there is no claim on this appeal that plaintiffs have not made such a showing or that the District Court's order is erroneous for lack of such a showing.

Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 788, 791-92 (D.C. Cir. 1971).

The second case that the government had relied on in Kerr was the 5th Circuit case of Carr v. Monroe Mfg. Co. 431 F.2d 384, 388-89 (5th Cir. 1970), in which the Court of Appeals affirmed a district court order requiring production of records from the State Employment Security Commission without redacting names and addresses of applicants for employment. The relevant part of the Court's analysis is as follows:

> The granting or withholding of any privilege requires a balancing of competing policies. The claim of governmental privilege is no exception; in fact, the potential for misuse of government privilege, and the consequent diminution of information about government available to the public, is one more factor which strongly suggests the need for judicial arbitration of the availability of the privilege. That the need for discovery of communications with a state governmental agency arises in a federal case in no way diminishes the need for an independent weighing by the court of the policies behind the privilege.
>
> Making even more compelling the need for judicial evaluation of the availability of the privilege is the fact that this is a suit against the highest official of the very government agency asserting the privilege. In such cases there is a special danger in the government official having the power to define the scope of his own privilege, free of supervision by the courts. As one pre-Reynolds court put it, in a similar suit:

> "Inasmuch as * * * the alleged actionable deviation from official conduct by the defendants is brought in issue by the answer * * *, it is eminently appropriate that all relevant documents which elucidate those vital issues * * * should not be withheld from the court. To rule otherwise in the absence of controlling authority would do violence to the court's duty to search for the truth and would be inimical to the traditional concept of (discovery). * * *"
>
> We conclude by holding that to sustain the assertion of privilege of concealment under the specific situation before the court would be tantamount to abdicating an inherent judicial function of determining the facts upon which the admissibility of evidence in a case depends.

Carr v. Monroe Mfg. Co. 431 F.2d 384, 388-89 (5th Cir. 1970).

The 9th Circuit has since followed Kerr in requiring a balancing of interests and *in camera* review in ruling on the government's claim of the official information privilege. See, e.g., Seminara v. City of Long Beach, 68 F.3d 481 (9th Cir. 1995) (affirming Magistrate Judge order compelling disclosure and stating "Federal common law recognizes a qualified privilege for official information. *Kerr v. United States Dist. Ct. for N.D. Cal.,* 511 F.2d 192, 198 (9th Cir.1975), *aff'd,* 426 U.S. 394, 96 S.Ct. 2119 (1976). In determining whether information sought is privileged, we must employ a balancing test, weighing the potential benefits of disclosure against the potential disadvantages"); Garrett v. City and County of San Francisco, 818 F.2d 1515, 1519 (9th Cir. 1987) ("Defendants also contend that the sought documents are protected by state-created privileges. In a Title VII action, of course, the federal common law of privilege controls. F.R.Evid. 501. This court has held that personnel files are discoverable in federal question cases, including Title VII actions, despite claims of privilege."); Breed v. U.S. Dist. Court for Northern Dist. of California 542 F.2d 1114, 1116 (9th Cir. 1976) ("Also, as required by Kerr, we recognize 'that in camera review is a highly appropriate and useful means of dealing with claims of governmental privilege.'").

The 9th Circuit provided more direction regarding the official information privilege in Sanchez v. City of Santa Ana, 936 F.2d 1027, 1033-34 (9th Cir. 1990), in which it affirmed a district judge's denial of discovery of city police department personnel files. The Court explained its reasoning as follows:

> Federal common law recognizes a qualified privilege for official information. *Kerr v. United States Dist. Ct. for N.D. Cal.,* 511 F.2d 192, 198 (9th Cir.1975), *aff'd,* 426 U.S. 394, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). Government personnel files are considered official information. To determine whether the information sought is privileged, courts must weigh the potential benefits of disclosure against the potential disadvantages. If the latter is greater, the privilege bars discovery.
>
> The relevance of plaintiffs' discovery request for employment data is undisputed. Most of the relevant information, however, could have been developed by interrogatories. It is well-settled that an employee may prove his or her claim of unlawful discrimination by evidence that other employees of different races or national origin were treated differently in similar circumstances.

Sanchez v. City of Santa Ana (9th Cir. 1990) 936 F.2d 1027, 1033-34, as amended on denial of reh'g (Feb. 27, 1991), as amended on denial of reh'g (May 24, 1991) (internal citations and quotations omitted).

Finally, although not binding on this Court, the case of Kelly v. City of San Jose, 114 F.R.D. 653 (N.D. Cal. 1987) from the Northern District of California thoughtfully and thoroughly evaluated issues regarding the official information privilege in the context of police files and has since been cited by many courts as they evaluate such privilege claims.  The Kelly court began by emphasizing the federal law governs questions of privilege in civil rights cases, although federal courts may look to state doctrine in order to understand state interests. Id. at 655-56 ("At the outset it is important to emphasize that in a civil rights case brought under federal statutes questions of privilege are resolved by federal law. . . . It obviously would make no sense to permit state law to determine what evidence is discoverable in cases brought pursuant to federal statutes whose central purpose is to protect citizens from abuses of power by state and local authorities.").  Moreover, "there has been no codification of federal privilege law," and many supposedly related doctrines do not appear to apply to this circumstance. Id. at 655-56.  The Court then listed the competing interests in play in privilege asserted by law enforcement agencies as follows:  "interests of law enforcement, privacy interests of police officers or citizens who provide information to or file complaints against police officers,

interests of civil rights plaintiffs, the policies that inform the national civil rights laws, and the needs of the judicial process." Id. at 660.  The Court then reviewed various cases and concluded that civil rights cases should involve a balancing approach that is moderately pre-weighted in favor of disclosure:

> In my view there are several considerations that justify adopting in these kinds of civil rights cases *a balancing approach that is* moderately *pre-weighted in favor of disclosure.*  As a general proposition, the public interests in the categories favoring disclosure (the policies underlying our civil rights laws, public confidence in the court system, and doing justice in individual cases) clearly outweigh the public interests in favor of secrecy (e.g., not compromising procedures for self-discipline within police forces or the privacy rights of officers or citizen complainants). As I suggest below, there has been substantial exaggeration of the size of the harm that limited disclosure might do to concededly legitimate law enforcement interests. And in the relatively rare case where there is a very real threat to obviously important law enforcement interests (as there could be, for example, if a plaintiff were seeking the names of confidential informants in on-going criminal investigations, or wanted to learn operational plans for imminent police activities), the moderate pre-weighting in favor of disclosure will not disable courts from protecting those law enforcement interests.
>
> There are additional considerations that support the conclusion that it is appropriate to adopt a balancing test that is moderately pre-weighted in favor of disclosure. Such pre-weighting is consistent with the well-established notion that because privileges operate in derogation of the truth finding process the law places the burden of proving all the elements essential to invoking any privilege on the party seeking its benefits. The pre-weighting also is consistent with the related idea that privileges generally are to be narrowly construed, and that doubts about their applicability are to be resolved in favor of disclosure.

Id. at 661-62.  The Court then endorsed the following list of factors worthy of consideration in assessing the balancing of interests:

> (1) The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information.
> (2) The impact upon persons who have given information of having their identities disclosed.
> (3) The degree to which government self-evaluation and consequent program improvement will be chilled by disclosure.
> (4) Whether the information sought is factual data or evaluative summary.

>    (5) Whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question.
>    (6) Whether the police investigation has been completed.
>    (7) Whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation.
>    (8) Whether the plaintiff's suit is non-frivolous and brought in good faith.
>    (9) Whether the information sought is available through other discovery or from other sources.
>    (10) The importance of the information sought to the plaintiff's case.

Id. at 663.  The Court then discussed at length issues involving disclosure of reports to law enforcement, an issue that is particularly relevant to the documents being withheld in the case before this Court:

> [Some] courts seem to assume that there is a greater risk that officers doing this work would not express their views honestly if they knew their words might be used against individual officers or the police department by a civil rights plaintiff. . . . There are at least two problems with the reasoning that supports this view. One is that the premise that supports it (that investigating officers will be less forthright in expressing their opinions if there is a risk of disclosure) is empirically unsupported and very debatable. The other problem with this line of reasoning is that after it acknowledges the great importance of enforcing federal civil rights policies it *fails to articulate a reason* for deciding to ascribe less weight to that enforcement effort than to the unmeasured harm to government interests that might follow from disclosure of evaluative material in internal affairs files. . . .
>
> Since no empirical study supports the contention that the possibility of disclosure would make officers who participate (as respondents or as investigators) in internal affairs investigations less honest it is doubly important to examine the assumptions that underlie that contention. If we posit two alternatives, one in which there is no possibility of disclosure and one in which there is some possibility of disclosure to litigants (protective orders can be used to prevent disclosure to the public generally), and ask which is most conducive to candor, strong arguments can be advanced that it is the alternative in which there is some possibility of disclosure. A police officer who knows that no one from outside the law enforcement community will scrutinize his statements or his investigatory work may not feel the same level of pressure to be honest and accurate as would his counterpart in a system where some disclosure was possible. An officer might expect that someone within his organization would be less exacting in reviewing his statements or reports than someone from the outside, especially if the person from the outside already has substantial information about the incident under investigation and has a strong motive to challenge the accuracy of the officer's memory or the reliability of his

conclusions. We rely in our adversary system of justice on the fear of being challenged and exposed by an opponent to keep litigants and lawyers honest. . . .

Fear of scrutiny by knowledgeable people motivated to be aggressive is likely to inspire police officers to conduct investigations and write reports that are less vulnerable to criticism, and the way to make them less vulnerable is to make them more thorough, more accurate and better reasoned. In short, officers will feel pressure to be honest and logical when they know that their statements and their work product will be subject to demanding analysis by people with knowledge of the events under investigation and considerable incentive to make sure that the truth comes out (i.e., a civil rights plaintiff and her lawyer). Thus there is a real possibility that officers working in closed systems will feel less pressure to be honest than officers who know that they may be forced to defend what they say and report. . . .

There is even less reason to believe that the possibility of disclosure to civil rights plaintiffs will discourage citizens from filing complaints against police officers. It is not at all clear that people who feel aggrieved by actions of police officers would even think about the possibility that their complaints might be disclosed to another person who feels aggrieved by police officers. And if they did think about it they presumably would want their complaint to help someone who had suffered from a similar source. A citizen who complains about police misconduct simply is not in the same position as a confidential informant or a citizen who offers information that is potentially damaging to another citizen. The obvious reasons people in the latter categories have for wanting to protect their anonymity simply have no bearing on the behavior of citizens who file complaints against the police themselves. It follows that, in the absence of special circumstances proved by law enforcement defendants, courts should ascribe little weight to a police department's purported interest in preserving the anonymity of citizen complainants.

Id. at 664-66.[1]

### III.    Application of Law to Documents Being Withheld

Turning to the facts in this case, the CDCR is withholding the following documents, which were submitted for *in camera* review:

---

[1] The Kelly Court goes on to describe a detailed process of invoking the privilege, which, although relied on by many courts, is not summarized because it is not relevant to the case before us.  Id. at 668 et seq.

11

- Institutional Executive Review Committee (IERC) Use of Force Review and Further Action Recommendation, critique and evaluation

- Cover sheets for forwarding of certain documents, intake acceptance letter, request for internal investigation, notice of assignment and similar bureaucractice documents, at least one of which contains personal information of Defendant Juarez including his social security number

- Investigative Report, including summary of allegations and summary of reports by correctional officers about what occurred in the underlying incident, summary of appeal and interview of Plaintiff, summaries of four inmate interviews, summary of interviews from correctional staff

- Appeal findings

- Crime incident reports and staff reports

- Holding cell log

- Medical report of injury

- Citizens complaint against personnel

- Advisement of Rights

- Administrative Memorandum

Notably, it appears that some documents are missing. The report contains summaries of ditigal recorded interviews, but does not include the interviews themselves in any format. Moreover, there are cover pages for Exhibits 7-15, but no documents are included behind those cover pages. As set forth in the order, these documents must be produced, or submitted for further *in camera* review, forthwith.

Overall, the withheld documents consistent of summaries of what witnesses claimed happened in the underlying event. (Again, the actual interviews are not included—only the summaries of such interviews.) They also include the results of the Office of Internal Affairs

analysis and findings based on these sources. These documents are all highly relevant. They are statements from percipient witnesses regarding what happened. Many of those statements were made at or near the time of the event. The medical reports also concern Plaintiff's condition after the event, which is relevant to assessing his injuries.

These documents do not reveal any institutional secrets. They do not discuss, for example, security measures within the prison or where security cameras are located within the institution. To the extent they reveal a procedure for investigation, it appears to be a completely intuitive procedure: evidence was gathered, summarized, and reported to decision makers for evaluation. Nothing in that process is extradinary or exposes the prison to a security risk.

The summary of inmate statements (again, without the underlying statements itself) bears particular emphasis. After all, the CDCR has withheld the documents based in part on the presence of inmate statements and the potential of harm coming to such inmates. Because it is relevant to the Court's analysis, and in light of the Court's decision compelling disclosure of these statements, a high level summary of the content of these statements is warranted. Quite simply, the statements from the four inmates all support Plaintiff's version of events. Without exception, all four inmates state that Defendant Juarez used force on the Plaintiff. Although in different words and with minor differences in the details, each inmate stated that Defendant Juarez kicked Plaintiff, twisted his arm, and yelled hostile statements at him. Each inmate was asked to estimate the amount of force used on Plaintiff on a scale of 1-10, and they all rated it either a 6 or 7.[2]

The Court is sensitive to issues involving confidential informants and security measures to protect inmates from other inmates. But it does not find such a threat with the inmates support of Plaintiff's version of events. There is also no allegation that there have been any

---

[2] The report also summarizes statements from five correctional staff, including the Defendant. Each correctional officer stated that Defendant had not kicked Plaintiff and had not used any force. Thus, each correctional officer confirmed the version of events set forth by the correctional officer Defendant.

13

disputes between Plaintiff and these inmates. While it is true that Plaintiff had a dispute with an inmate immediately before the incident at issue, there is no statement included from that inmate. Thus, it appears that the CDCR is withholding statements from inmate bystanders that largely confirm what Plaintiff said happened.

The content of these inmate statements is not just important in balancing the interests involved in overruling the privilege. It reveals the context behind the Defendant and the CDCR's long history of objection and withholding. They have invoked the official information privilege to hide multiple witness accounts supportive of Plaintiff and against the correctional officer defendant. Suffice to say, withholding information contrary to a party's position is not a proper use of the privilege. Indeed, it is the reason that courts have been highly wary of a government body making its own determination of the official information privilege. That privilege is not codified in federal law and does not provide clear bright line test. Instead, as described at length above, it requires a balancing test of the importance of the information against the harm to legitimate security interests caused by disclosure. By its repeated objection, the Defendant and CDCR represented that the balancing test favored withholding this information. Indeed, they gave the impression that the statements might be from confidential informants, such that disclosure might cause Plaintiff to attack them. Obviously, they did not reveal that the information at issue was percipient witnesses supporting Plaintiff's version of events. The comparison between their description of the contents and security risks involved and the actual documents is troubling. In short, the Court is concerned that Defendant and the CDCR have been misleading in their description of underlying information in order to shield from discovery highly relevant information that goes against their interest. Such conduct is all the more concerning when a *pro se* litigant is involved.

The withheld material also includes the findings from the Office of Internal Affairs. These are not nearly as relevant because they are the opinions, rather than facts. Their opinions are not binding on the fact finder, and may indeed not be admissible. Nevertheless, given the specific facts in this case, the Court does not see a security reason to withhold them as privileged.

The Court does see a basis to withhold all private information about the Defendant, including home address and social security number. Although the Court did not notice any private information about any other person, in the abundance of caution, the Court authorizes redaction of any personal information of any person included, besides their name and position at the prison.

In conclusion, the Court overrules the official information privilege objection by the CDCR, except regarding limited personal information as described above. The Court has reviewed the materials and performed a balancing test and finds that the interests of disclosure outweigh the interests of any legitimate security interest of the CDCR in withholding the information. The Court notes that this is a fact-specific finding based on the specific contents of these documents.

## IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Within 14 days from this order, the CDCR shall provide Plaintiff with all documents withheld under the official information privilege and provided *in camera* to the Court. The CDCR shall redact any personal information of any person, with the exception of their name and position.

2. Within 14 days from this order, the CDCR shall either provide Plaintiff with all additional documents and materials regarding the Investigation by the Office of Internal Affairs of this incident, or provide them to the Court for further *in camera* review. This includes all written or recorded interviews associated with the investigation, as well as Exhibits 7-15.

3. Within 14 days from this order, the CDCR shall provide a status report to this Court confirming such production or providing an explanation why no further production was made, such as that no additional documents were located despite references to them in the documents already provided.

4. Within 7 days of this order, if the CDCR believes that, consistent with the case law and findings discussed in this order, further redactions are required (such as for a

security feature of the prison or similar detail that the Court might have overlooked within the report), it may submit a request for redaction and proposed redaction to the Court.

IT IS SO ORDERED.

Dated:  **July 7, 2016**                              /s/ *Erica P. Grosjean*
                                                    UNITED STATES MAGISTRATE JUDGE