**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERTO GARCIA JR., <br><br> Plaintiff <br><br> v. <br><br> MATTHEW JUAREZ JR., <br><br> Defendant | CASE NO. 1:12-CV-0750 AWI EPG PC <br><br> **ORDER RE: MOTION TO ENFORCE SETTLEMENT AND MOTION TO STRIKE** <br><br> **(Docs. 159 and 167)** |

**I. Background**

Plaintiff Roberto Garcia, Jr. is a former inmate held at Kern Valley State Prison. Defendant Matthew Juarez, Jr. is a sergeant at that facility. Plaintiff alleges that on May 23, 2011, Defendant handcuffed and kicked him while verbally threatening him, resulting in injuries to both of Plaintiff's shoulders. Plaintiff received treatment for his right shoulder at the time but not for his left shoulder. On May 8, 2012, Plaintiff filed suit under 42 U.S.C. § 1983 alleging that Defendant used excessive force against him. On January 26, 2017, Plaintiff filed a notice of tentative settlement. Doc. 141. Soon thereafter, the parties encountered difficulties in completing/executing their settlement and requested a settlement conference. Doc. 146. A telephonic settlement conference was held on March 15, 2017 but the parties were unable to resolve their problems. Doc. 150. Defendant then filed a motion to enforce the settlement agreement. Doc. 159. Plaintiff opposes the motion and made a motion to strike certain statements in Defendant's motion as scandalous. Docs. 167 and 168.

## II. Motion to Enforce Settlement Agreement

"[C]ourts have inherent power summarily to enforce a settlement agreement with respect to an action pending before it." Dacanay v. Mendoza, 573 F.2d 1075, 1078 (9th Cir. 1978).

The parties have discussed settlement on multiple occasions. On August 15, 2016, they held a settlement conference before Magistrate Judge Sheila Oberto. Doc. 93. No settlement was reached. Before this hearing, Defendant revealed that Plaintiff owed more than $29,000 in restitution. Doc. 168, 4:15-17. Plaintiff was released from custody on October 24, 2016. Doc. 117. Plaintiff's current pro bono appointed counsel, Brian McComas, entered the case on October 19, 2017. Doc. 113. Plaintiff inquired as to the possibility of additional settlement negotiations on December 29, 2016 and Defendant suggested that any settlement should be communicated initially in written form. Doc. 132, 18:27-19:2.

Plaintiff sent Defendants a demand letter on January 17, 2017. Doc. 168-2. The parties communicated orally concerning the amount of settlement. Doc. 168, 5:16-17. Plaintiff sent a supplemental demand letter on January 23, 2017. Doc. 168-3. The parties agreed upon the terms of a settlement on January 24. Doc. 160, 2:5-6; Doc. 168, 5:19-20. Plaintiff e-mailed Defendant that night, stating "Please call me in the morning to followup on my voice message on behalf of plaintiff agreeing to the defendant's offer of $13,000 for dismissal of all claims with prejudice." Doc. 168-4. On January 26, Plaintiff filed a notice of tentative settlement on January 26, 2017. Doc. 141. On January 27, Plaintiff e-mailed Defendant seeking the release form, stating "I have the opportunity to see Mr. Garcia next weekend and would like to finalize everything then." Doc. 168-5.

On February 1, Defendant sent to Plaintiff a written settlement agreement and payee form ("Written Agreement") to be signed by Plaintiff and Plaintiff's counsel. Doc. 160, 2:8-10. Of note, the Written Agreement included a provision which stated that the settlement amount would have to be used to pay for certain reimbursements, including restitution. Doc. 161-1, Section 5. On February 6, Plaintiff and Defendant had a telephone conversation; Defendant memorialized the conversation in an e-mail in which he wrote "the agreement is fine and approved except you found a typo on the front page where the dollar amount was printed out. We removed the reference to

hundred to fix that and otherwise kept everything the same. Please confirm your receipt and approval. I will also convey to my contact at the CDCR that you believe that sums subject to reimbursement under the general order that you expended from court funds need to come to you so that you can pay them back." Doc. 168-6. Plaintiff responded to that e-mail the same day and stated "I agree to the small revision in the agreement, the signed version of which went out today. My specific request is for the entire settlement to be dispersed to my IOLTA account so that I may then properly disperse the funds for attorney expenses, Pro Bono Panel expenses, and my client in accordance with tax requirements, auditing of my account, and my ethical duties." Doc. 168-7. As referenced in the e-mail, Plaintiff returned to Defendant by mail the Written Agreement, signed and dated by both Plaintiff and Plaintiff's attorney on February 4, 2017; included in the mailing was a cover letter ("Feb. 6 Letter") which stated "Dispersal of the settlement needs to be made to IOLTA ACCOUNT - LAW OFFICE OF B.C. McCOMAS so that I can repay expenses and the Pro Bono Panel via General Order 510. Please let me know if this method of payment will be an issue as execution of the agreement is contingent upon it." Doc. 161-1 and 161-2.

On February 7, Defendant e-mailed stating "Just reviewed your email and looked back at the settlement agreement....will pay whatever net sums your client may be entitled to the plaintiff directly. If there is some other payment proves than directly to your client, I believe it will not be honored unless spelled out in the agreement. Do you believe we need to revisit the agreement or go with what we have and you coordinate monies with your client?" Doc. 161-3. On February 8, 2017, Plaintiff e-mailed stating "The letter makes clear that the signing of the release is contingent upon payment to IOLTA ACCOUNT - LAW OFFICE OF B.C. McCOMAS....I would ask that you add the above term concerning my IOLTA account or we reach an agreement that any payment will be made to that account." Doc. 161-4. The same day Defendant responded by e-mail that "I believe I will need to modify the paragraph that says payment to Plaintiff to identify your trust account [] instead and you[r] client will need to approve the change. I will verify and get back to you." Doc. 168-8.

On February 13, Defendant sent by e-mail a revised written settlement agreement ("Revised Agreement") with a cover letter which stated "If the revisions meet you and your

3

client's approval, please email me confirmation of the same and please arrange to send the document executed by yourself and your client along with the stipulation of dismissal with the original executed document set to me for processing along with the fully completed and executed Payee Data Record." Doc. 161-5. The modifications in the Revised Agreement state that $6,202.50 would be paid to the IOLTA account and that the balance of the settlement would be paid to the IOLTA account only after other reimbursements, including restitution, were paid. Doc. 161-5, Section 5. Later that day, Plaintiff responded by e-mail, stating "I do not believe that the additions are consistent with our conversations, or my prior emails setting out exactly what Plaintiff wants included in the settlement agreement. I have repeatedly asked for one thing: that the entire settlement award be dispersed to my IOLTA account without any prior reductions. The additional language only further obfuscates what should be a simple term of agreement....I await CDCR's response to my simple question: Is it willing to disperse the entire settlement of 13,000 to my IOLTA account? If not, we may have a real problem." Doc. 168-12. The same day, Defendant replied by e-mail that based on California Penal Code § 2085.5, "it appears that the CDCR would be appropriately deduct[ing] any applicable restitution amounts." Doc. 161-7. The Revised Agreement was never signed by either party.

On February 15, Plaintiff sent a letter which stated that "Based on our prior discussions, it is plaintiff's understanding that defendant is unwilling to settle unless the CDCR is granted the sole authority to disperse the settlement as it determined for restitution and legal expenses. As outlined above, this requirement violates CDCR's stated procedures and my ethical obligations as counsel, and results in an unenforceable agreement. Worse, the insistence on inclusion of this term has scuttled negotiations by impeding the parties to agree upon material terms. Hopefully, you share my concerns about the development of this stumbling block, which threatens to unravel all of our prior agreements, so late in negotiations." Doc. 168-13. On February 27, Plaintiff sent a letter which stated "Plaintiff intends to move to stay the schedule in the matter and request a settlement conference before Judge Grosjean." Doc. 168-14. On March 2, Plaintiff sent another letter that reiterated "plaintiff's position is that all of the funds should be awarded to his attorney without prior reduction by the CDCR." Doc. 161-8.

4

A second settlement conference was held on April 24, 2017, before Magistrate Judge Oberto. Doc. 153. The parties were not able to resolve their dispute. On April 26, Defendant sent a letter which stated "I am now taking this opportunity to again assert our position that the case is settled pursuant to the attached [Written Agreement]"; Defendant's counsel had signed but not dated the attached Written Agreement. Doc. 161-9. On May 3, Plaintiff responded by mail that "the defense never asserted this position during settlement negotiations between February 6 and April 25, 2017, during which time it continued to modify the tentative settlement. Plaintiff was first informed of a potential change in defendant's position by Judge Oberto at the settlement conference on April 24, 2017. Your letter is the first memorialization of this shift in position by the defense." Doc. 168-19.

In the present motion to enforce settlement agreement, Defendant asserts that "Plaintiff and Defendant entered into a written Settlement Agreement...settling all claims in the instant suit and the Agreement was signed by the Plaintiff and Plaintiff's counsel....Thereafter, Plaintiff's counsel attempted to alter immaterial terms of the Agreement." Doc. 160, 1:18-21. Defendant also stated that "there can be no dispute that the parties reached a settlement agreement and its terms are clear and unambiguous because they were reduced to a writing jointly negotiated by the parties and signed by Plaintiff and his counsel." Doc. 160, 7:1-3. Thus, Defendant appears to be asserting that the agreement became enforceable when Plaintiff sent the signed Written Agreement to Defendant on February 6, 2017; that the Written Agreement came into effect on that date notwithstanding the concurrent e-mail seeking to alter the means of payment or any later dickering over terms.

Defendant does not appear to be asserting that the parties reached an oral agreement at any time that is enforceable apart from the Written Agreement. "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an

offer." Lopez v. Charles Schwab & Co., 118 Cal. App. 4th 1224, 1230 (Cal. App. 1st Dist. 2004), citations omitted. "If there 'is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done.' An agreement to make an agreement, without more, is not a binding contract." Rennick v. O.P.T.I.O.N. Care, 77 F.3d 309, 315 (9th Cir. 1996), quoting Smissaert v. Chiodo, 163 Cal. App. 2d 827, 330 P.2d 98, 100 (Cal. App. 1st Dist. 1958). Given the evidence presented, there is no basis for finding that the agreement reached on January 24, 2017 was intended to be an enforceable contract.

In evaluating the Written Agreement, "the construction and enforcement of settlement agreements are governed by principles of local law." Jones v. McDaniel, 717 F.3d 1062, 1067 (9th Cir. 2013), citations omitted. In determining whether a settlement agreement was enforceable, the Central District summarized the applicable California contract law as "there is no contract until there has been a meeting of the minds on all material points. The failure to reach a meeting of the minds on all material points prevents the formation of a contract even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract. Similarly, the terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror, which must also be unequivocally accepted by the former offeror for a binding contract to form." Siegel v. Warner Bros. Entm't Inc., 542 F. Supp. 2d 1098, 1138 (C.D. Cal. 2008), citations omitted. Most of Defendant's briefing in this case concerns the first requirement: the meeting of the minds on all material points. However, this court finds that the agreement is unenforceable due to failure of the second requirement: unqualified acceptance.

"An acceptance must be absolute and unqualified, or must include in itself an acceptance of that character which the proposer can separate from the rest, and which will conclude the person accepting. A qualified acceptance is a new proposal." Cal. Civ. Code § 1585. "Under traditional common law, no contract was reached if the terms of the offer and the acceptance varied." Steiner v. Mobil Oil Corp., 20 Cal. 3d 90, 99 (Cal. 1977) (distinguishing the requirements

6

under general contract law from the U.C.C.). California law "requires an acceptance to be absolute and unqualified, so that any attempt to modify the terms of an offer in response thereto constitutes a rejection of the offer and a new counterproposal." Smith v. Westland Life Ins. Co., 15 Cal. 3d 111, 116 (Cal. 1975). "[I]n manifesting an intent to be bound an acceptance must be clear, positive and unambiguous; an acceptance, though consistent with the terms of the offer, can be so equivocal that it fails to clearly express an intention to be bound." Roth v. Malson, 67 Cal. App. 4th 552, 561 (Cal. App. 3d Dist. Oct. 28, 1998), dissenting opinion. "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." Meyer v. Benko, 55 Cal. App. 3d 937, 942-43 (Cal. App. 2nd Dist. 1976), citations omitted. In one old case, the buyer placed a special order for equipment with the full amount due to be invoiced; the seller accepted the order, agreeing to build the equipment, but noting that one third of the bill was due within 30 days of the placing of the order, referencing earlier discussion between the parties. The court characterized the exchange as: "The outstanding fact is that the defendant made an offer; that the plaintiff accepted it only with the addition of important new conditions, which was not a valid acceptance. Consequently, there was no contract between the parties." Apex Engineering Co. v. North American Oil Consol., 76 Cal. App. 683, 687 (Cal. App. 1st Dist. 1926).

In this case, Defendant sent Plaintiff the Written Agreement. Plaintiff and Plaintiff's counsel signed the Written Agreement. However, in returning the Written Agreement to Defendant, Plaintiff attached the Feb. 6 Letter which directly stated "Dispersal of the settlement needs to be made to IOLTA ACCOUNT - LAW OFFICE OF B.C. McCOMAS so that I can repay expenses and the Pro Bono Panel via General Order 510. Please let me know if this method of payment will be an issue as execution of the agreement is contingent upon it." Doc. 161-2. In response, Defendant's February 7 e-mail stated "Just reviewed your email and looked back at the settlement agreement....will pay whatever net sums your client may be entitled to the plaintiff directly. If there is some other payment proves than directly to your client, I believe it will not be

honored unless spelled out in the agreement. Do you believe we need to revisit the agreement or go with what we have and you coordinate monies with your client?" Doc. 161-3. The Written Agreement was an offer by Defendant. In response, Plaintiff returned it signed with the Feb. 6 Letter. The language used in the Feb. 6. Letter was direct and explicit, conditioning acceptance of Defendant's offer on agreement with the additional term. The package as a whole (the Feb. 6 Letter and signed Written Agreement) was a conditional acceptance which constituted a counteroffer. In response, Defendant did not accept the counteroffer and negotiations continued. After that point, additional concerns over the settlement payment prevented the two sides from coming to an agreement. As with another case in which a tentative settlement was deemed unenforceable, "This give and take reveals that the parties, while close to agreeing to a complete and comprehensive settlement of their dispute, had not passed the threshold where they had finalized and assented to all material terms of such a settlement. Rather, as they attempted to sketch in the finer details of a settlement from the broad outlines contained in the October 19 letter, more and more issues arose upon which they could not reach agreement, resulting in the negotiations falling apart." Siegel v. Warner Bros. Entm't Inc., 542 F. Supp. 2d 1098, 1138 (C.D. Cal. 2008).

In opposing Plaintiff's argument, Defendant states "The Cover Letter Signed By Mr McComas Had No Impact Upon The Enforceability Or The Terms Of The Settlement Agreement." Doc. 169, 8:21-23. Defendant's briefing generally presupposes acceptance and focuses on how the Feb. 6 Letter affects (or does not affect) the terms of the contract given the language of the Written Agreement. Defendant only mentions the issue of acceptance in passing: "Mr. McComas tried to modify a term in an express written, integrated contract signed by his client by way of a cover letter that was not signed by his client. His proposed modification is inconsistent with the Agreement and not a material term for the plaintiff. It does not qualify as a conditional acceptance." Doc. 169, 11:5-8.

Defendant's points do not line up neatly with the issues discussed in this order but they do not change the conclusion that there was no acceptance in this case. The fact that Plaintiff signed the Written Agreement does not, by itself, constitute acceptance. "Consent is deemed to be fully

communicated between the parties as soon as the party accepting a proposal has put his acceptance in the course of transmission to the proposer..." Cal. Civ. Code § 1583. Any acceptance could only take place through communication with Defendant; in this case, by mailing the signed Written Agreement back to Defendant. However, the response was accompanied by the Feb. 6 Letter, which contained a condition Defendant claimed was inconsistent with the terms of the Written Agreement. That made the response a counteroffer and not an unequivocal acceptance. As for the fact that the letter was signed only be Plaintiff's attorney and not Plaintiff himself, that is of no consequence in settlement negotiations. "Generally, when a client hires an attorney and holds him out as counsel representing him in a matter...the third party may rely on the attorney's apparent authority unless he has reason to believe that the attorney has no authority to negotiate a settlement." Cristobal v. Siegel, 26 F.3d 1488, 1495 (9th Cir. 1994), quoting Capital Dredge and Dock Corp. v. City of Detroit, 800 F.2d 525, 530-31 (6th Cir. 1986). There is no indication that Plaintiff's counsel did not have authority to make a counteroffer. The fact that the condition Plaintiff added in the Feb. 6 Letter might not be considered a material term for purposes of general contract interpretation does not render it a nullity. In looking at contract acceptance, it is acknowledged that parties might add conditions which an outsider would consider unimportant. Nevertheless, failure to accept the unimportant conditions can prevent a contract from coming into existence. "If to the acceptance a condition be affixed, or any modification or change in the offer be requested, by the party to whom the offer is made, this, in law, constitutes a rejection of the offer...Where it is apparent that one party has not consented to the several terms to which the other has agreed, no contract is formed. If the divergence is of anything which partakes of the substance of the contract at all, there is no legal agreement; and the court is not at liberty to speculate upon the question whether some stipulation which it might think of minor importance, or some variation which it might think would not have influenced the parties in making the contract, can be dispensed with, and the parties held, in disdregard of them." Lacey v. Thomas, 164 F. 623, 627 (C.C.D. Or. 1908), quoting James v. Darby, 100 F. 224, 228 (8th Cir. 1900) and Kleinhans v. Jones, 68 F. 742, 749 (6th Cir. 1895).

    Additionally, Defendant cites to two cases in which a settlement agreement was enforced

notwithstanding disputes over how restitution was to be paid from a settlement agreement. They are distinguishable as there was no question as to unqualified acceptance in those cases; the courts' analyses focused on the separate issue of whether there was a meeting of the minds on material terms. In Holt, Defendants sent plaintiff a written settlement agreement; plaintiff signed and returned the agreement. At that point, there was unequivocal acceptance of an offer and the settlement agreement became enforceable. It was not until later that the issue of where payment should be sent arose. See Holt v. MacArthur, 2014 WL 940327, at *3 (S.D. Cal. Mar. 10, 2014) ("In light of Plaintiff's admission to the existence of a settlement agreement, this Court assumes the correctness of Judge Crawford's factual findings and adopts them in full"). In Davenport, the agreement was reached in a settlement conference overseen by a judge: "based upon the Court's involvement in the settlement conference, the transcript of the hearing and the parties' briefing, the Court concludes that the parties knowingly and voluntarily entered into a complete agreement and intended to be bound by the terms of the agreement. After meeting with the parties and being informed that they had agreed to settle the action, the parties placed their agreement on the record.... Defendant and Plaintiff's oral agreement with the terms of the settlement stated on the record created a binding agreement." Davenport v. Korik , 2016 WL 6039027, *3-5 (E.D. Cal. Oct. 14, 2016). An oral agreement negotiated as part of a settlement conference overseen by a judge, with all material terms put on the record, and with verbal confirmation by all parties to be bound by the agreement is generally enforceable without detailed factual inquiry by the court. Doi v. Halekulani Corp., 276 F.3d 1131, 1137 (9th Cir. 2002). Subsequently, the plaintiff objected to the payment of any restitution, fines, fees, or taxes from the settlement amount but the later dispute did not render the settlement unenforceable. In the present case, by contrast, the dispute over where payment is to be sent arose before any contract came into being.

      There is an exception to the requirement of unqualified acceptance. When the new condition restates a legal condition which automatically applies, courts have found the conditional acceptance sufficient for enforcing a contract. In one case, "This was a meeting of the minds of the parties upon the same terms and conditions, save and except that the last telegram referred to had in it these words, 'subject permission inspection on arrival.' The matter of delay in shipment

had been eliminated, the request that the bank guarantee payment had been accepted, and all conditions imposed by defendant had been met, qualified by the added suggestion that the beans would be subject to inspection on arrival. It is the claim of counsel for appellant that it never assented to the plaintiff's request that the beans should be shipped subject to inspection; but, as the learned judge of the trial court observed, the law would have added these words to the contract, even if they had not been inserted in the telegram." Humphry v. Farmers' Union & Milling Co., 47 Cal. App. 211, 213–14, (Cal. App. 3rd Dist. 1920). The Ninth Circuit has stated this rule as "That an acceptance of an offer is not rendered insufficient to consummate a contract, by a condition which would be implied in fact of by law, is recognized by a number of authorities." Mach. Tool & Equip. Corp. v. Reconstruction Fin. Corp., 131 F.2d 547, 556 (9th Cir. 1942) (discussing Oregon contract law). Plaintiff's additional condition in the Feb. 6 Letter is not a circumstance which is implied by law. In fact, Defendant emphatically asserts that Plaintiff's condition is "not consistent with either the [Written] Agreement or California law, specifically Penal Code 2085.5 et seq." Doc. 160, 8:15-16. There is no basis to apply this exception to the Feb. 6 Letter.

### III. Motion to Strike

In Defendant's motion to enforce settlement agreement, Defendant included language in the brief stating "the changing of the location where the net settlement proceeds are to go is of no consequence to Defendant, nor does it appear to be a term designed to benefit Plaintiff. Presumably, Plaintiff could have easily assigned or given any monies to his attorney without Defendant's involvement. Rather, the proposed change appears to be more of an afterthought (a couple of days later) by Plaintiff's attorney to benefit or protect him." Doc. 160, 8:6-10. Plaintiff objects to the language used: "The allegation scandalously implies that the dispersal is somehow designed to benefit the undersigned counsel....Defendant either implies that counsel changed the terms of the settlement to protect himself in violation of ethical duties, or that counsel seeks personal benefits over plaintiff's interests in breach of ethical duties." Doc. 167, 2:7-8 and 3:13-15. Plaintiff seeks to have the language stricken under Fed. Rule Civ. Proc. 12(f). Doc. 167, 1:26-27.

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. Rule Civ. Proc. 12(f). A pleading is defined as "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer" in contrast to "Motions and Other Papers." Fed. Rule Civ. Proc. 7(a) and (b). The Ninth Circuit has recognized that Rule 12(f) does not permit striking materials generally: "Under the express language of the rule, only pleadings are subject to motions to strike. The appellees have cited no cases that have construed F.R.Civ.P. 12(f) as allowing a district court to strike material not contained in the pleadings of the case." Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983); see also Arveson v. Mont. DHHS, 2016 U.S. Dist. LEXIS 86803, *6 (D. Mont. July 5, 2016) ("DPHHS' brief is not a pleading as defined in Rule 7(a). Thus, Rule 12(f) does not provide Arveson with a basis for striking DPHHS' brief"). Plaintiff's motion must fail.

Additionally, the language objected to does not directly accuse Plaintiff's counsel of unethical behavior. One of the issues the parties have extensively discussed is the duty to reimburse the Eastern District's Non Appropriated Fund for the services of Plaintiff's pro bono appointed counsel. The applicable rule states "In the event of settlement or other successful resolution of the case which results in a monetary award to the indigent litigant equal to or exceeding the reimbursed costs under this section, the indigent litigant through counsel shall reimburse the Fund for such out-of-pocket expenses allowed and reimbursed under this section. Counsel shall reimburse the Fund within thirty (30) days of settlement or judgment. Counsel shall ensure that such reimbursement occurs prior to any disbursement of judgment or settlement funds to counsel, plaintiff or any other person." Eastern District of California General Order No. 558 Section 3.B. Defendant explains that the objected to language obliquely refers to the affirmative obligation the Eastern District places upon Plaintiff's counsel to take control of the settlement monies to reimburse the Fund. Doc. 170, 1:25-2:2. Plaintiff's counsel has multiple duties he must simultaneously fulfill. While Defendant's tone may be snide and unnecessary, the language is not so inflammatory as to warrant court sanction. To be clear, there is nothing in the record to suggest

that Plaintiff's counsel has in any way violated his ethical duty to his client in seeking to have the settlement monies disbursed into his IOLTA account.

### IV. Conclusion

Defendant's motion to enforce settlement is DENIED.

Plaintiff's motion to strike is DENIED.

The trial date of August 29, 2017 is VACATED. The parties should be prepared to set a new trial date at the pretrial conference on July 11, 2017.

IT IS SO ORDERED.

Dated:  July 6, 2017

_____
SENIOR DISTRICT JUDGE